Peter J. CASTELLI, M.D., Plaintiff,

v.

MEADVILLE MEDICAL CENTER and Robert A. Driscoll, M.D., Defendants.

Civ. A. No. 87–84 Erie.

United States District Court,
W.D. Pennsylvania.

Oct. 18, 1988.

---

William T. Jorden, Jorden and White, Meadville, Pa., for plaintiff.

Irving O. Murphy, Erie, Pa., for Robert A. Driscoll, M.D.

Barbara Blackmond, Alan Steinberg, Horty, Springer & Mattern, P.C., Pittsburgh, Pa., for Meadville Medical Center.

## MEMORANDUM OPINION

MENCER, District Judge.

Peter J. Castelli, M.D. brought this action asserting seven counts for violations of federal antitrust laws and three counts for related state law infractions. His claims arise out of an exclusive contract between Meadville Medical Center and Robert A. Driscoll, M.D. The defendants filed a Motion for Summary Judgment which is presently pending before this court.

### 1. *Facts*

Prior to January 1, 1986, two hospitals operated in Meadville, Pennsylvania. Peter J. Castelli, M.D. (Castelli) had an exclusive radiology contract at Spencer Hospital. Robert A. Driscoll, M.D. (Driscoll) had an exclusive radiology contract at Meadville City Hospital.

With the permission of the Federal Trade Commission, the two hospitals merged to form Meadville Medical Center (MMC). To facilitate the transition, the hospital boards appointed a Consolidation Task Force (Task Force). The Task Force, in turn, hired APM, Inc. (APM), a management consulting firm.

Based in part on the recommendation of APM, the Task Force decided to award exclusive contracts for all hospital-based physician departments, including radiology. The Task Force then embarked on a lengthy and hotly-contested selection process to determine the recipient of the exclusive contract. This court will outline the events leading to Driscoll's selection.

The two leading candidates were the radiologists from the former hospitals, Castelli and Driscoll. The Task Force met individually and collectively with both doctors in an attempt to reach an amiable solution. It also audited both departments. Neither approach led to a selection. APM then proposed a job description for the position which included board certification

as a job requirement. The Task Force adopted the proposed job description. Because only Driscoll was board certified, the Task Force awarded the contract to him (Castelli had apparently taken the boards several times but had not passed them).

The Task Force ordered Driscoll to offer Castelli employment under his supervision. Driscoll grudgingly complied, but the open friction between Driscoll and Castelli precluded such an arrangement. Castelli declined employment and, instead, filed this Complaint.

### 2. *Legal Analysis*

#### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if, upon a review of the materials properly before the court, "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Summary judgment may be granted in spite of some alleged factual disputes between the parties because Rule 56(c) requires only that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). While a court must view the evidence in the light most favorable to the non-moving party, *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983), summary judgment must be granted "against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 273 (1986); Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2727 (Supp.1987).

#### B. Counts I and II

■ In Castelli's Amended Complaint, Counts I and II are collectively entitled "Unreasonable Restraint of Trade in Violation of Section 1 of the Sherman Act and Per Se Liability as a result of a Group Boycott in Violation of Section 1 of the Sherman Act." Castelli alleges that Driscoll's exclusive contract has resulted in more expensive, lower quality radiology services. He alleges that the exclusive contract constitutes an anticompetitive boycott, and as such is a per se violation of Section 1 of the Sherman Act (§ 1). Each of the defendants, individually and jointly, participated in the "contract, scheme and conspiracy designed to injure plaintiff, his business and property." Amended Complaint at p. 14.

In the Third Circuit, to sustain a § 1 claim, the plaintiff must prove:

> (1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anticompetitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy.

*Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 147 (3d Cir.1981), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982).

In support of its motion for summary judgment with respect to Counts I and II, MMC argues that Castelli has failed to allege sufficient facts for two of the four elements of § 1. First, MMC contends that Castelli cannot establish a conspiracy by the defendants.

Technically, § 1 does not require a conspiracy. The section requires proof of "a contract, combination, ... or conspiracy." 15 U.S.C. § 1. The courts have not interpreted this language to provide for three alternative relationships between defendants. Rather, the three phrases describe the requirement of a quantum of "concerted action" in a § 1 case. *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980).

The Supreme Court addressed the requirements for concerted action under § 1 in *Monsanto v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). In considering an alleged conspiracy between an herbicide manufacturer and its distributors brought by a disgrun-

tled former distributor, Justice Powell wrote, "There must be evidence that tends to exclude the possibility that the manufacturer and the non-terminated distributors were acting independently.... [T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 764, 104 S.Ct. at 1471 (quoting *Edward J. Sweeney & Sons v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir. 1980)). In other words, to support a claim of conspiracy, Castelli must raise genuine issues of fact as to whether MMC and Driscoll agreed that MMC would award an exclusive contract, that Driscoll would obtain the contract, and that the purpose would be anticompetitive.

In 1986, the Supreme Court further refined the quantum of circumstantial evidence necessary to infer concerted action. In *Matsushita Electric Industrial Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), some American companies alleged a conspiracy to fix prices by some Japanese companies. The Court held that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Id.* at 588, 106 S.Ct. at 1357. "If [the defendant's] conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Id.* at 596–97, 106 S.Ct. at 1361.

A court in this district considered the § 1 "concerted action" requirement under facts very similar to this case. In *Robinson v. Magovern,* 521 F.Supp. 842 (W.D.Pa.1981), *aff'd mem.,* 688 F.2d 824 (3d Cir.), *cert. denied,* 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982), a thoracic surgeon who was denied staff privileges at a hospital brought an antitrust action against the hospital and the surgeon with staff privileges. In granting summary judgment for the defendants, the court wrote that, "Concerted activity within the scope of § 1 ... occurs when one business entity takes action at the request of a second business entity.... If the [hospital] discontinues its business relationship with a [doctor] for its own independent reasons, no concerted activity has occurred." *Id.* at 907.

The defendants contend that the facts in this case closely parallel those in *Robinson.* All the evidence, they argue, indicates that MMC made an independent, unilateral business judgment to award an exclusive radiology contract. There is no evidence whatsoever, they maintain, that suggests a conspiracy with Driscoll.

Castelli chose not to respond to the defendants' motion to dismiss Counts I and II, but we have examined the record for genuine issues of material fact. An examination of Castelli's factual assertions reveals only two possible sources of support for his allegations of conspiracy or concerted activity. First, Castelli calls attention to a memorandum drafted by APM, MMC's management consultants. The memorandum recommends establishing objective criteria to apply to the new radiology group because, "You are providing someone with a monopoly and you must control it as best you can." Castelli Exh. 2. Second, Castelli offers a letter written by Driscoll to William DeArment, Chairman of Meadville City Hospital proposing to hire Castelli for a minimum six month period. Driscoll wrote, "Therefore, to prevent any further politicalization of what I consider an issue of quality; to allay any fears possible antitrust action [sic]; and hopefully to promote a sense of unity among the medical staff ..." Castelli Exh. 3. Finally, Castelli cites testimony that Driscoll met privately with DeArment. Castelli Exh. 19.

Considered individually or collectively, Castelli's factual allegations do not support a finding that Driscoll and MMC engaged in concerted activity or a conspiracy. Under the standard set forth by the Supreme Court in *Monsanto* and *Matsushita,* Castelli has the burden of alleging facts more consistent with anticompetitive concerted activity than with legitimate business activity. In this case, the facts are much more consistent with a unilateral decision by MMC than with any conspiracy including Driscoll.

Specifically, MMC hired APM as management consultants during the process of merging the two hospitals. APM recommended awarding an exclusive radiology contract. Nothing in the record contradicts this scenario. Indeed, Castelli seems to have conceded that no conspiracy occurred, because he did not even respond to the defendants' motion.

■ The defendants second argument is that Castelli has not and cannot establish an unlawful or anticompetitive objective. A hospital's selections of medical staff are presumed to be based on legitimate medical and business reasons. *Pontius v. Children's Hosp.*, 552 F.Supp. 1352, 1372 (W.D. Pa.1982). Thus, in order to avoid summary judgment, Castelli must demonstrate that MMC lacked substantial evidence in support of its decision to award an exclusive contract. *Id. See also Smith v. Northern Michigan Hospitals, Inc.*, 703 F.2d 942, 953 (6th Cir.1983) (granting summary judgment in part because the plaintiff failed to present evidence contradicting the hospital's showing that it had awarded an exclusive emergency room contract for legitimate reasons).

■ MMC offers a plausible sequence of events leading to the awarding of an exclusive contract to Driscoll. First, MMC hired APM to advise on the mechanics of consolidating the two hospitals. APM recommended awarding exclusive contracts in the anesthesiology, pathology, and radiology departments. MMC adopted APM's suggestion, and evaluated Driscoll and Castelli for the radiology position. Based on articulable criteria, primarily Driscoll's board certification and Castelli's lack thereof, MMC selected Driscoll.

Again, Castelli has chosen not to respond to MMC's arguments. The only evidence that this court could detect even vaguely implying an anticompetitive motive are the memorandum drafted by APM, Castelli Exh. 2, and the letter written by Driscoll, Castelli Exh. 3. The APM memorandum is clearly insufficient circumstantial evidence; APM merely acknowledges that an exclusive contract gives the recipient a monopoly of the hospital's radiology work. It does not suggest that MMC should adopt the exclusive contract approach for anticompetitive purposes. Although Driscoll's letter reflects an awareness of potential antitrust complaints, it does not reflect an anticompetitive motive behind the decision to employ one radiologist exclusively.

It seems to this court that the reason Castelli did not support Counts I and II of his Complaint is that discovery did not yield sufficient direct or circumstantial evidence of concerted activity or anticompetitive purpose to sustain an action under § 1. Because Castelli seems to have conceded these counts and because this court did not uncover any genuine issues of material fact in its own examination of the record, we will grant the defendants' motion with respect to Counts I and II.

## C. Counts III, IV, and V

In Counts III, IV, and V, Castelli asserts actions for per se liability pursuant to Section 2 of the Sherman Act (§ 2) based on actual monopolization, attempt to monopolize, and conspiracy to monopolize the administration of radiology in the Meadville area.

Before the court can determine whether the defendants have violated § 2, we must define the relevant market. The relevant market for antitrust purposes has two components, geography and product. Both components require legal conclusions by the court, often with the guidance of experts.

■ First, we will examine the product or service that the defendants allegedly monopolize. The parties seem to agree that hospital radiology services consist of two components. The "hospital component" includes overhead, equipment, and personnel. The "professional component" represents the professional interpretation of x-rays. Castelli bases his entire Complaint on the fact that MMC awarded Driscoll an exclusive contract to perform the professional services at MMC. Thus, this court finds that the relevant service is professional radiology services in connection with inpatient treatment.

With respect to the geographic market, this court is not prepared to make a finding based on the record. Castelli's expert advocates using a portion of Crawford county that excludes Titusville, the location of the only competing hospital in the county. His geography results in a 100 percent market share for MMC. The defendants maintain that the area should be the nationwide market for radiologists, and certainly an area larger than that selected by Castelli. Although it seems to this court that the portion of Crawford county advocated by Castelli is arbitrarily drawn and may not reflect the consumers ability to travel to other facilities, we do not make such a finding. Instead, we will assume for purposes of this motion that the defendants have monopoly power over inpatient professional radiology services in the relevant geographical market.

In order to establish liability for monopolization under § 2, the plaintiff must prove: (1) the defendant has monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as the result of product quality, business acumen, or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). In order to establish an attempt to monopolize under § 2, Castelli must prove: (1) a specific intent to monopolize the relevant market; and (2) sufficient existing market power that there is a dangerous possibility of success. *Pontius v. Children's Hosp.*, 552 F.Supp. 1352, 1376 (W.D.Pa.1982). In order to establish a conspiracy to monopolize, Castelli must prove: "(1) an agreement or understanding between two or more economic entities, (2) a specific intent to monopolize, and (3) the commission of an overt act in furtherance of the alleged conspiracy." *Id.* at 1377.

Each of these § 2 claims requires a showing that the defendants had an unlawful intent to monopolize. *Id.* The act that Castelli claims violated the Sherman Act was the awarding of an exclusive contract. Thus, the issue under § 2 is whether MMC had an unlawful intent to monopolize when it awarded the exclusive radiology contract.

The mere fact that Driscoll's contract was exclusive is not sufficient to prove intent to monopolize. A company with monopoly power can deal exclusively with a single business entity provided that it has a substantial business justification for its refusal to transact with others, and that its purpose was not solely to preserve or increase its monopoly power. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

The defendants argue that Castelli has no evidence tending to show that they exercised their market power in an improper manner. MMC decided to award a unilateral contract based on the recommendation of their management consultants and the industry wide practice of awarding unilateral contracts in many departments including radiology. *See Houser v. Fox Theatres Management Corp.*, 845 F.2d 1225 (3d Cir. 1988) (finding evidence of industry standards and business reasons sufficient for summary judgment under § 2).

Castelli asserts that conduct aimed at destroying a competitor satisfies the intent requirement of the various § 2 tests. He claims that the awarding of the exclusive contract to Driscoll prevented him from practicing radiology and removed him from competition.

In support of his arguments, Castelli cites *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). In *Aspen*, the parties were two competing skiing resorts who had a history of sharing marketing programs. The defendant, the larger of the resorts, terminated the sharing, and the plaintiff sued. The Court held that, while monopolies had no general duty to deal with others, once they have established a long-term pattern, they cannot break the pattern without a legitimate business reason. We find that *Aspen* does not support Castelli's action. First, we note that both hospitals had exclusive contracts before the merger, and that preservation of the status quo was impossible following the merger.

Second, we note that MMC has proffered valid business reasons for an exclusive contract.

In sum, Castelli has asserted that he was injured when Driscoll got the exclusive contract. This contention is insufficient to sustain his burden of production. The primary deficiency in his argument is that he fails to produce any evidence of an intent to injure him or a motive to injure him. Castelli merely alleges that the effect of not obtaining the exclusive contract was an injury to him, not that the decision to use an exclusive contract was designed to drive him out of business. Some evidence, either direct of circumstantial, of an intent to monopolize is an essential element of Counts III, IV, and V of Castelli's Complaint. *Pontius*, 552 F.Supp. at 1377. Having found no such evidence on the record, we consequently find no genuine issues of material fact, and will grant the defendants' motion.

D. Count VI

█ In Count VI, Castelli asserts a claim for per se liability based upon an invalid tying arrangement in violation of § 1. Tying occurs when two separate products are sold as a package so that one cannot be purchased without the other. To be actionable under § 1, the manufacturer of the tying product must have monopoly power in its market sufficient to coerce purchase of the tied product, and the tying arrangement must have anticompetitive effects in the tied market. *Griffing v. Lucious O. Crosby Memorial Hospital*, 1984–1 Trade Cases p 65,854 (S.D.Miss.1984) [1984 WL 2936]. Furthermore, the manufacturer of the tying product must garner some economic benefit from the tying arrangement. *Venzie Corp. v. United States Mineral Prods. Co., Inc.*, 521 F.2d 1309, 1317 (3d Cir.1975).

█ Exclusive contracts between hospitals and doctors have been the target of numerous tying actions. *Griffing v. Lucious O. Crosby Memorial Hospital*, 1984–1 Trade Cases p 65,854 (S.D.Miss. 1984), contains facts almost identical to this case. In *Griffing*, the plaintiff formerly had the radiology contract at a hospital. When the hospital awarded an exclusive contract to a different doctor, the plaintiff sued both the hospital and the doctor. In granting summary judgment, the court wrote:

There is no unlawful tying unless the seller of the tying product also competes in the market for the tied product, either by selling the tied product itself or by receiving profits, commissions or rebates from the sale of the tied product.... The defendant Hospital is not profiting from the sale of the claimed tied services.... The payment which [the doctor] receives is for professional services rendered by him.... Finally, and significantly, the Hospital itself is not competing in the market for professional radiology services and receives no profit or other payment from any participation in that market.

*Id.* at 67,564–65. *See also White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98 (4th Cir.1987) (hospital not a competitor in the market for professional interpretation of CT scans, so no tying); *Drs. Steuer & Latham v. Nat. Med. Enterprises*, 672 F.Supp. 1489, 1508–09 (D.S.C.1987) (hospital not a competitor in the market for professional pathological services, so no tying).

The Supreme Court considered allegations of tying by a disgruntled anesthesiologist in *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). The Court granted summary judgment in favor of the hospital because it did not have monopoly power, but held that the arrangement otherwise might have been illegal. *Hyde* can be distinguished from this case, however, in two critical areas. First, in *Hyde*, the hospital billed patients for the anesthesiology services, then split the proceeds with the anesthesiologist. Thus, the hospital profited from the anesthesiology services and, to a certain degree, competed in that market. In this case, Driscoll bills patients directly for his services, so MMC does not profit from the radiology services. Second, several cases including *Hyde* itself have held

that anesthesiology differs significantly for purposes of the Sherman Act from radiology and pathology. *Id.* at 22 n. 36, 104 S.Ct. at 1564 n. 36; *Collins v. Associated Pathologists*, 676 F.Supp. 1388, 1403, (C.D.Ill. 1987), *aff'd*, 844 F.2d 473 (7th Cir.1988) (distinguishing *Hyde* ).

After reviewing the evidence, we find that Castelli has not satisfied one of the essential elements of a tying action, the requirement that the holder of the monopoly power benefit economically from the arrangement. Therefore, we will grant the defendants' motion.

**E. Count VII**

█ In Count VII, Castelli asserts a claim for per se liability under the essential facility doctrine. This doctrine provides for liability under § 1 when one who controls an essential facility refuses to allow access to the facility on fair terms. *Hecht v. Pro–Football, Inc.*, 570 F.2d 982, 992–93 (D.C.Cir.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). An essential facility is defined as one which cannot practicably be duplicated be willing competitors. The facility need not be indispensable, merely economically infeasible to duplicate. *Id.* The doctrine should be applied selectively, because "the antitrust laws do not require that an essential facility be shared if such sharing would be impractical or would inhibit the defendant's ability to serve its customers adequately." *Id.*

Courts have frequently refused to apply the essential facility doctrine to hospitals and their staff. In *Pontius v. Children's Hosp.*, 552 F.Supp. 1352, 1370 (W.D.Pa. 1982), Judge Cohill wrote, "The essential facilities doctrine is inapplicable to hospital staff privileges decisions." *See also Drs. Steuer and Latham v. Nat. Med. Enterprises*, 672 F.Supp. 1489, 1507 (D.S.C.1987); *McMorris v. Williamsport Hosp.*, 597 F.Supp. 899, 915 n. 15 (M.D.Pa.1984); *Robinson v. Magovern*, 521 F.Supp. 842, 913 (W.D.Pa.1981).

█ This court is in full agreement with the consistent decisions of other courts not to apply the essential facilities doctrine to

exclusive service contracts by hospitals. Furthermore, if there were a case in which a hospital would be an essential facility, MMC would not be that hospital. Within a forty mile radius of MMC, there are eight other hospitals at which Castelli potentially could practice. *See* MMC Exh. 36. Additionally, MMC offered Castelli the opportunity to practice, albeit as Driscoll's employee. Because we are persuaded that the essential facilities doctrine is not appropriate for a hospital's decisions about professional services, we will grant the defendants' motion with respect to Count VII.

**F. Counts VIII, IX, and X**

█ Counts VIII, IX, and X contain state law claims. Because we have dismissed all of the federal claims, we can only retain the state law claims via a discretionary exercise of pendant jurisdiction. We choose not to exercise such discretion, and will dismiss Counts VIII, IX, and X without prejudice.

**ORDER**

AND NOW, this 18th day of October, 1988, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that:

(1) The Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part;

(2) Judgment is entered in favor of Meadville Medical Center and Robert A. Driscoll and against Peter J. Castelli on Counts I, II, III, IV, V, VI, and VII of the Complaint; and

(3) Counts VIII, IX, and X of the Complaint are DISMISSED without prejudice.