Randhir CHAUHAN, Appellant,

v.

M. ALFIERI CO., INC., Appellee.

No. 89–5136.

United States Court of Appeals,
Third Circuit.

Argued Sept. 6, 1989.
Decided Feb. 28, 1990.

Douglas J. Kinz (argued), Totowa, N.J., for appellant.

John F. Casey (argued), Kimmelman, Wolff & Samson, Roseland, N.J., for appellee.

Before BECKER, COWEN and WEIS, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This discrimination case comes to us on appeal from an order of the district court granting summary judgment for defendant, M. Alfieri Co., Inc., a commercial real estate developer, and against plaintiff, Randhir Chauhan, a small businessman of Indian nationality. Chauhan contends that in leasing its Metro III commercial office building in Edison, New Jersey, M. Alfieri unlawfully discriminated against him in violation of 42 U.S.C. § 1981 (1981) and the New Jersey Law Against Discrimination, N.J.Stat.Ann. 10:5 (West 1976 & Supp. 1989). After discovery, the district court concluded that, although Chauhan had made out a prima facie case of discrimination, M. Alfieri had proffered a legitimate, non-discriminatory reason for failing to lease to him, and that Chauhan had failed to offer evidence from which a jury could reasonably conclude that M. Alfieri's proffered answer was pretextual. The court therefore granted summary judgment on Chauhan's section 1981 claim, and dismissed the N.J.S.A. claim for lack of jurisdiction. *Chauhan v. M. Alfieri Co., Inc.,* 707 F.Supp. 162 (D.N.J.1988).

The case is close, but we find that the inconsistencies and implausibilities contained within M. Alfieri's explanation for its conduct are of sufficient magnitude to constitute enough evidence of pretext for the plaintiff to survive summary judgment. We therefore reverse and remand for trial.

### I.

### A.

Chauhan has been a permanent resident in this country since 1982. During this time, he has purchased, operated, and sold several sundry shops in New Jersey. M. Alfieri owns Metro Park III and IV, two adjoining office buildings. Small retail establishments operate in the lobbies of both buildings. Chauhan alleges that he was discriminated against on the basis of race when he tried to lease some space in one of M. Alfieri's buildings. As is not uncommon in discrimination cases, the chronology is critical.

Chauhan first approached M. Alfieri on November 16, 1985. Harry Schultz, M. Alfieri's Executive Vice President, met briefly with Chauhan. Schultz did not make any commitment to Chauhan, but told him that space was available and suggested that he provide a copy of his federal income tax return. Chauhan sent Schultz his IRS 1040 form the next day. On December 6, 1985, Schultz returned the 1040 form along with a letter stating that M. Alfieri was unable "to make a commitment for your type of business." The letter suggested that Chauhan call back in about six months.

In mid-December, 1985, M. Alfieri hired Stephen Del Guercio to act as a leasing representative. Del Guercio's job was to promote and negotiate leases for the Metro Park project.

In late January, 1986, a month and a half after Chauhan had been turned away, Jerry Landau, a former sales representative for Montgomery Ward, approached Del Guercio, inquiring about potential retail space for a card and gift shop. On February 3, 1986, Del Guercio addressed a memo to Schultz advising him that he was preparing retail space on the first floor for use as a card and gift/newsstand shop. Schultz was told at that time that "leases [were] being drawn up and [would] be sent out immediately." App. at 341. Although a rental commitment was not made to Landau until April 1986, negotiations between Messrs. Landau and Del Guercio continued from December through April. The two men discussed what kind of goods Landau would be selling, what kind of space he would need, and the contingency of a Small Business Administration loan.

On April 18, 1987, roughly four months after he was turned away by Schultz, Chauhan made an appointment to see Del

Guercio. On April 21, 1986, Del Guercio and Chauhan met and discussed Chauhan's plans for a sundry shop. Del Guercio requested that Chauhan provide a copy of an IRS 1040 form. The two men met again on April 22, 1986, prompting Del Guercio to prepare a Lease Information Form for Chauhan. Three days later, however, on April 25, 1986, Landau signed a lease with M. Alfieri.[1] That afternoon, when Chauhan delivered a floor plan to Del Guercio, Del Guercio informed him that the space had already been rented. Four days later, on April 29, 1986, Schultz countersigned Landau's lease, making it final.

### B.

M. Alfieri maintains that its refusal to negotiate with Chauhan originally and the subsequent negotiations with Landau represent nothing more sinister than the right hand of an organization not knowing what the left hand is doing. The district court agreed with this characterization of M. Alfieri's behavior, finding that, at most, the behavior "demonstrate[ed] ... business inefficiency and miscommunication." M. Alfieri hired Del Guercio to do the leasing because the company wanted one person to be in charge. M. Alfieri maintains that Schultz and Del Guercio never talked about Chauhan's November inquiry and Chauhan

adduced no evidence to the contrary. According to M. Alfieri, Del Guercio proceeded to do his job and, by the time Chauhan came back in April of 1986, the deal with Landau was all but complete.

Chauhan argues that M. Alfieri's explanation is pretextual. In support of this contention, Chauhan points to the contradictions and implausibilities in the deposition testimony of M. Alfieri's witnesses. Schultz testified that the reason he would not have started negotiations with Chauhan in December of 1985 related to the relatively low occupancy rate and the potential difficulties a small sundry shop might have turning a profit in a less than fully occupied building. *See* App. at 171. Yet, according to Del Guercio, the occupancy rate did not change between December and January, when negotiations with Landau commenced. Del Guercio testified that the occupancy rate was around 60% from mid December through the end of January. *See id.* at 203, 224.

■ In contrast, Schultz testified that at the time Landau approached M. Alfieri, the building was 90–95% rented, *see* id. at 179, thus casting doubt on both Del Guercio's figures and Schultz's reason for originally rejecting Chauhan.[2] Additionally, Schultz testified that retail space had already been rented to a bank, a dry cleaner and a print

---

1. Landau signed the lease only a few hours after he learned that his Small Business Administration loan had been approved.

2. We do not believe that the conflicting testimony with regard to the occupancy statistics can be considered inconsequential. Although both Schultz's and Del Guercio's figures might be considered "guestimates," this is not a case of "guestimates" being only a few percentage points off. In the world of industrial leasing, a 30–35% difference in occupancy rates is significant.

With regard to whose responsibility it was to clarify the inconsistency, we observe the following. During the deposition of Mr. Schultz on August 25, 1988, this colloquy transpired:
Q. You have no other records in your possession or in the possession of M. Alfieri Company that would enlighten us as to how much or what percentage of the building was actually rented back from December 1985?
A. We have records in our office as to what percentage was rented in December 1985.
Q. If I intend to obtain those records or ask you to obtain them, do you have any problem in providing them to your counsel?

A. No.
MR. CASEY: However, they are subject to review or any applicable trade secret, confidentiality or privilege which may apply.
MR. KINZ: Sure.
The papers submitted by Chauhan in opposition to the summary judgment motion do not reveal that these records were ever obtained. It is difficult to determine whether the lack of documentation stems from Chauhan's failure to follow through or M. Alfieri's failure to produce. During the deposition of Mr. Del Guercio on September 9, 1988, Mr. Casey, M. Alfieri's counsel, stated the following with reference to certain leasing documents:
"At this point in time, just anticipating what may be coming up, I will simply put on the record the representation that the files of M. Alfieri were to my knowledge searched for all documents responsive to a document demand previously served in this action, and that there exist no other documents which would be responsive to that document demand."
Because discovery papers are not filed of record, *see* Fed.R.Civ.P. 5(d) and District of New Jersey Local Rule 12, we cannot be sure wheth-

shop by the time Landau came along. *See id.* at 177–78. It is unclear who rented these other retail spaces and when they were rented. Apparently, Chauhan requested copies of these leases, but M. Alfieri did not provide them. *See id.* at 315.[3]

Del Guercio's primary responsibility was office, not retail space. If Schultz had rented to other retailers, a jury might legitimately question why he was unwilling to rent to Chauhan. If other retailers were committed to by January, and there had been little change in occupancy since December, a jury might wonder why Chauhan was told, a scant month earlier, that he should call back in six months because M. Alfieri was not in a position to negotiate. Prepared leases were sent to Landau on February 7, 1986, only two months after Chauhan was turned away. Moreover, contrary to M. Alfieri's position, it appears that Del Guercio was in communication with Schultz.[4]

## II.

■ A successful section 1981 claim requires proof of intentional discrimination.

*General Building Contractors Association v. Pennsylvania,* 458 U.S. 375, 389, 102 S.Ct. 3141, 3149, 73 L.Ed.2d 835 (1982); *Croker v. Boeing Co.,* 662 F.2d 975, 988 (3d Cir.1981). However, because of the evidentiary difficulties involved in proving discriminatory intent, we have held that summary judgment motions in section 1981 cases are governed by the well-known burden shifting provisions laid down in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), and refined in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). *See Gunby v. Pennsylvania Electric Co.,* 840 F.2d 1108, 1115 (3d Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989); *Lewis v. University of Pittsburgh,* 725 F.2d 910, 914 (3d Cir.1983), *cert. denied,* 469 U.S. 892, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1984). Although we have not had occasion to consider whether the *McDonnell Douglas* formula should be applied to the leasing context, other courts

er the percentage occupancy figures were requested. We understand that Fed.R.Civ.P. 5(d) serves the salutary purposes of encouraging informal discovery and saving space in the Clerk's Office and we do not suggest that counsel should not take advantage of that rule. However, where failure to produce documents bears on the completeness of a summary judgment record, all counsel have an obligation to call to the court's attention relevant failures to produce.

In this case, inasmuch as it was M. Alfieri, the moving party, that had the obligation to produce evidence of a legitimate business purpose, we believe that it was M. Alfieri's responsibility to produce any documentation that would clarify inconsistencies in the deposition of its own employees. As we discuss, Chauhan's burden, once M. Alfieri has proffered a legitimate business purpose, is to point out inconsistencies in the employer's story. If the employer can rectify those inconsistencies with documents in its own possession, it must do so before asking a court to grant summary judgment on its behalf. While Chauhan bore the ultimate burden of proving pretext, we believe that he had a right to rely on the deposition testimony of M. Alfieri's employees without having to ferret out documents, the existence of which is in question and the content of which may or may not clarify the inconsistencies created by the opposing party.

Judge Weis believes that because plaintiff had the burden of proving pretext, the obligation to produce Alfieri's records was on plaintiff as the party opposing the grant of summary judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Schultz had testified that he would provide the records of occupancy. Plaintiff has not stated that he neglected to review the documents or that they supported or opposed the testimony. Judge Weis believes that, the "off the cuff" guestimates involved here do not constitute adequate evidence of pretext and he does not rely on that material. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("Factual disputes that are . . . unnecessary" will not preclude summary judgment). Because, however, the other evidence does sufficiently raise issues of fact that must be resolved by a jury, he concurs in the result reached by the majority.

**3.** It is also difficult to determine whether this lack of documentation stems from Chauhan's failure to follow through or M. Alfieri's failure to produce, *see supra* n. 2.

**4.** In addition to the matters referenced *supra* at 125, Schultz was aware that a Mr. Turna, who operated a sundries shop in a nearby hotel, was a potential lessee of the space. App. at 246. Hence, there is evidence that the matter had not been completely delegated to Del Guercio.

have done so, *see, e.g., Seldon Apartments v. United States Department of Housing and Urban Development*, 785 F.2d 152, 160 (6th Cir.1986) (Fair Housing Act, 42 U.S.C. § 3601 and § 1981 and § 1982); *Phiffer v. Proud Parrot Motor Hotel, Inc.*, 648 F.2d 548, 551 (9th Cir.1980) (§ 1982); *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1038–39 (2d Cir.1979) (Fair Housing Act, 42 U.S.C. § 3604(a)), and we will follow their lead.

Applying the *McDonnell Douglas* formula to this context, Chauhan establishes a prima facie case by proving that: (1) he is in a protected class; (2) he attempted to lease the space; (3) he was a qualified applicant; and (4) the space remained unfilled after he applied. Once a prima facie case is established, the burden then shifts to M. Alfieri to offer a legitimate, non-discriminatory reason for refusing to do business with Chauhan. If M. Alfieri proffers such a reason, the burden shifts back to Chauhan to show that M. Alfieri's explanation is pretextual. The district court properly followed this formula. However, in concluding that "the inconsistencies pointed out by Chauhan, while perhaps demonstrating some business inefficiency and miscommunication in the operation of Alfieri, do not lend any support to [Chauhan's] contention [of pretext]," 707 F.Supp. at 166, the district court appears inadvertently to have strayed into the fact-finding realm.

The *McDonnell Douglas* formula is grounded in the presumption that if a rational reason for disparate treatment is not forthcoming, it is more likely than not that illegal discrimination played a role in the decision. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977). The formula is further grounded in the presumption that intentional discrimination is often difficult to prove. *See Trans World Airlines v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985). Requiring direct evidence of pretext denies the plaintiff the benefit of the presumptions that are necessary if the plaintiff is to "have his day in Court, despite the unavailability of direct evidence." *Id.* (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir.1979)).

In the past two years this court has made a number of pronouncements about exactly what the plaintiff needs to produce in order to create a jury question with regard to pretext. In *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987), we held that a plaintiff does not need direct evidence of pretext in order to survive summary judgment. Instead, a plaintiff needs to be able to "point[ ] to evidence which calls into question the defendant's intent." *Id.* at 899. "[A] plaintiff who has made a *prima facie* showing of discrimination, need only point to evidence establishing a reasonable inference that the employer's proffered explanation is unworthy of credence." *Sorba v. Pennsylvania Drilling Co.*, 821 F.2d 200, 205 (3d Cir.1987), *cert. denied*, 484 U.S. 1019, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988). Hence, "[a] defendant which is less than honest in proffering its [legitimate, nondiscriminatory] reason ... risks an unnecessary ... discrimination verdict." *Chipollini*, 814 F.2d at 899.

*Chipollini* and *Sorba* must not be read to mean that a plaintiff in a discrimination action always survives summary judgment when the plaintiff calls the defendant's proffered explanation into question, however. "To create a factual dispute as to pretext, [the plaintiff] must not only introduce evidence from which a reasonable person could infer that he is qualified; he also must introduce evidence that casts doubt on [the defendant's] contention that there was a legitimate business justification for [defendant's action]." *Healy v. New York Life Insurance Co.*, 860 F.2d 1209, 1220 (3d Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989). Thus, the *McDonnell Douglas* presumptions entitle a member of a suspect class to the benefit of the doubt initially, but once the defendant has given a non-discriminatory reason for its actions, the plaintiff seek-

128

ing to defeat a summary judgment motion must produce or point to some evidence, in addition to the basic facts necessary to establish the prima facie case, indicating that the defendant's reason is pretextual.

█ In sum, the plaintiff cannot rely solely on a potential finding that the defendant's explanation is implausible. The fact that a judge or jury might disbelieve the defendant's asserted nondiscriminatory reason is not enough, by itself, to preclude summary judgment. Rather, the plaintiff must be able to adduce evidence, whether direct or circumstantial, from which a reasonable jury could conclude that the defendant's explanation is incredible. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). *See also Williams v. Borough of West Chester*, 891 F.2d 458, 459–61 (3d Cir.1989) (discussing when circumstantial evidence is sufficient to survive summary judgment).

Chauhan has pointed to evidence necessary to pass this test. The inconsistencies in M. Alfieri's explanation, as pointed out by Chauhan, present precisely the kind of "inconsistencies and implausibilities in [M. Alfieri's] proffered reasons" that "*could* support an inference [of discrimination]," *Chipollini*, 814 F.2d at 900 (citing *Graham v. F.B. Leopold Co.*, 779 F.2d 170, 172–73 (3d Cir.1985) (emphasis in original)). Schultz testified that he did not want to lease to a small business that might not be able to turn a profit in a building with a low occupancy rate, but this explanation is undermined by Del Guercio's willingness to enter into negotiations with Landau as early as January, less than two months after Chauhan had been turned away and told to call back in six months. There is conflicting, yet critical, testimony on what the occupancy rate was in December and January. Schultz said that the occupancy rate was 60% in December, but 90–95% by the time Landau applied. This means that the building was 90–95% rented two months after Chauhan was turned away. But Del Guercio stated that the occupancy rate did not change from December to January. These are inconsistent explanations.

At summary judgment we must be concerned not with whether the evidence "*necessarily*" leads to [a discriminatory finding]," but whether it could. *Chipollini*, 814 F.2d at 900 (citing *Graham v. F.B. Leopold Co.*, 779 F.2d 170, 172–73 (3d Cir. 1985)) (emphasis in original). Moreover, racial prejudice need not be the only factor in the decisionmaker's mind before a court finds the action discriminatory. It is sufficiently egregious if the applicant's race "made a difference." *See id.* at 897. We recognize that M. Alfieri's actions may constitute nothing more than corporate inefficiency and bad judgment, that indeed the proverbial right hand may not have known what the left hand was doing. But that is a determination to be made by a jury, not by the judge on a summary judgment motion. In short, although the demonstrated inconsistencies in M. Alfieri's explanation do not necessarily make it incredible, and although, as we have noted, the case is close, they cast significant enough doubt on the defendant's story to preclude summary judgment.

The judgment of the district court will be reversed and the case remanded for trial.