**Christopher ALLEN, M.D., Bryan C. Donohue, M.D. and John Cava, M.D., Plaintiffs,**

v.

**THE WASHINGTON HOSPITAL, Telford W. Thomas, John Frazier, M.D. and Neil Hart, M.D., Defendants.**

No. CIV. A. 96–1950.

United States District Court, W.D. Pennsylvania.

Jan. 12, 1999.

Anthony Cillo, Cohen & Grigsby, Pittsburgh, PA, for Plaintiffs.

Larry A Silverman, Dickie McCamey & Chilcote PC, Pittsburgh, PA, for Defendants.

## OPINION and ORDER OF COURT

AMBROSE, District Judge.

Plaintiffs Bryan C. Donohue, M.D., and John Cava, M.D., conduct a medical practice in cardiology located in Washington, Pennsylvania. Donohue and Cava employ Plaintiff Christopher Allen, M.D., a black physician, who is certified in and specializes in internal medicine and cardiology, and who also holds a sub-specialty in interventional cardiology. The Plaintiffs filed a five-count Amended Complaint against Defendants The Washington Hospital ("the Hospital"), Telford W. Thomas, its President and CEO, John Frazier, M.D., a member of the Board of Trustees and a staff member, and Nell Hart, M.D., a staff member. Specifically, the Plaintiffs asserted violations of 42 U.S.C. § 1981 and antitrust statutes, as well as claims for breach of contract and interference with existing and prospective contractual relations. Essentially, the Plaintiffs claim that the Defendants acted in such a manner as to preclude the Plaintiffs from expanding their practice at the Hospital.

The Defendants previously filed a Motion to Dismiss, challenging each claim. By prior Opinion and Order, I denied the Motion in all respects save one. I dismissed Count III—insofar as it was premised upon a claim for interference with existing contractual relations.

Pending is the Defendants' Motion for Summary Judgment (Docket No. 35). The Defendants seek the entry of judgment in their favor on each of the remaining claims.

The Plaintiffs oppose. After careful consideration, and for the reasons set forth below, the Motion is granted in part and denied in part. It is granted with respect to the claims set forth in Counts III (interference with a prospective contractual relation) and Count V (conspiracy to monopolize under § 2 of the Sherman Act). The Motion is denied, however, with respect to all remaining counts.

## STANDARD

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Rule 56 mandates the entry of judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946, 949 (3d Cir.1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material when it might affect the outcome of the suit under the governing law. *Id.* Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affida-

vits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

## ANALYSIS

### I. Count I—42 U.S.C. § 1981

Allen contends that the Hospital's and Thomas' failure to provide him with an application for a staff position in internal medicine, and the resulting failure to hire him, constitutes a violation of 42 U.S.C. § 1981. Section 1981 provides:

> [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. "Section 1981 [thus] grants to all persons equal rights under the law." *Walker v. Comay*, 640 F.Supp. 195, 197 (W.D.Pa.1986).

Here, the Defendants do not dispute that Allen has articulated a *prima facie* case of discrimination under § 1981. Accordingly, under the familiar analysis announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the burden shifts to the Defendants to articulate some legitimate, nondiscriminatory reason for the challenged action. *See Chauhan v. M. Alfieri Co., Inc.*, 897 F.2d 123, 127 (3d Cir.1990). The Defendants have met this burden by proffering evidence that Allen was denied an application because he was a trained cardiologist, that he worked with a group providing cardiology services, and that a Moratorium existed which precluded granting staff privileges to cardiologists.

Consequently, the burden shifts back to Allen to demonstrate that the articulated reason is merely a pretext for discrimination. *Chauhan*, 897 F.2d at 127. The Defendants

argue that Allen cannot establish pretext. I disagree. The record reveals that Allen assured Thomas that, if given privileges, he intended only to practice internal medicine. *See* Plaintiffs' Appendix, Ex. 40. Yet Allen was denied privileges. However, Thomas and the Hospital accepted another physician's (Dr. Richard Hart-who is white) representation that he intended to practice only internal medicine. As with Allen, Hart's training was in an area covered by the Moratorium (infectious diseases). *See* Thomas Transcript, p. 137. I recognize that Hart's and Allen's positions differed in some regards.[1] Even so, I find the differences in treatment accorded the physicians to be telling.

Additionally, it does seem implausible that the Hospital would be concerned that, if it granted Allen staff privileges for internal medicine, that he would somehow secretly perform cardiology services. For Allen to do so, he would have to utilize the cardiology lab and/or an operating room. I agree with the Plaintiffs that the "notion that any internist could sneak a patient into a catheterization lab or operating room for a cardiology is ludicrous." *See* Plaintiffs' Brief, p. 20.

Furthermore, the Hospital's treatment of white pulmonologists is revealing. Two pulmonologists appalled for staff privileges in critical care medicine while a moratorium existed for pulmonology. The applications were accepted and processing began. Only after Allen's application was denied were the pulmonologists' applications and fees returned. While the Hospital contends that it was initially unaware that the physicians were pulmonologists (a specialty covered by the Moratorium), the record suggests otherwise. *See* Plaintiffs' Appendix, Ex. 50. A jury could reasonably infer that the applications and fees were returned only after the Hospital realized that it had treated a black applicant in a different manner.

Thus, for the reasons set forth above, Allen is entitled to proceed to trial. Conse-

---

1. For instance, Hart was not associated with a group which practiced primarily, if not exclusively, in an area covered by the Moratorium.

Additionally, Hart, unlike Allen, had not initially applied for privileges in an area covered by the Moratorium.

quently, the Defendants' Motion for Summary Judgment is denied in this regard.

## II. *Count IV—Antitrust Violations*

In Count IV, the Plaintiffs allege that the Defendants have unlawfully restrained trade and have attempted to obtain a monopoly on cardiology services. The Defendants seek the entry of judgment, in their favor, on both claims, and advance several bases for such action. I will address each argument separately.

### (A) Standing

The Defendants assert that the Plaintiffs lack standing to prosecute the claims. In so urging, the Defendants employ a two prong test referenced in this Court's earlier decision. While the Defendants do not challenge the sufficiency of the evidence with respect to the first prong (whether the plaintiffs have suffered an antitrust injury), they do challenge the sufficiency of proof with respect to the second. Essentially, the Defendants contend that the Plaintiffs cannot establish that they are "the most efficient enforcers" of the antitrust laws. *See* Defendants' Brief, p. 13.

The Plaintiffs counter that the Defendants have impermissibly altered and truncated the appropriate test. First, Plaintiffs allege, they need not be *the* most efficient enforcer, but merely *an* efficient enforcer. The case most often cited as the genesis of "the most efficient enforcer" language is, the Plaintiffs insist, misquoted. I agree that in *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1449 (11th Cir.1991), the court spoke of "an" efficient enforcer.

Secondly, the Plaintiffs contend, the inquiry proffered by the Defendants is actually a compressed version of the five factor inquiry set forth in an opinion rendered by the United States Supreme Court. *See Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 545, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). According to the Plaintiffs, these factors are as follows:

(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing;

(2) whether the plaintiff's alleged injury is the type for which the antitrust laws were intended to provide redress;

(3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims;

(4) the existence of more direct victims of the alleged antitrust violation; and

(5) the potential for duplicative recovery or complex apportionment of damages.

*See* Plaintiffs' Brief, p. 25, *quoting, In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144, 1164–65 (3d Cir.1993). I agree that these factors are relevant to the issue of standing. Indeed, I identified these same factors in my earlier Opinion denying the Defendants' Motion to Dismiss.

Unfortunately, the Defendants' have failed to take heed of such reference. In fact, the Defendants do not provide any substantive analysis of the *Associated General* factors, or of the application of such factors to the nuances of this case.

Certainly the Defendants do cite to a litany of cases for the proposition that there exist more direct victims of the harm. *See* Defendants' Brief, p. 14–15. And this does translate to the fourth factor under *Associated General.* Yet this factor is not dispositive. Indeed, if it were, the Supreme Court's direction to consider four additional factors in assessing standing would be meaningless.

 Moreover, the Defendants have already conceded (for purposes of this Motion), that the Plaintiffs have suffered an antitrust injury—the second factor under *Associated General.* The only other passing reference the Defendants make to the *Associated General* test is an assertion that the claim is necessarily speculative (the third factor), because the Plaintiffs' income has increased steadily over the past few years. Yet I agree with the Plaintiffs that "[t]he relevant question is not whether Plaintiffs have been successful, but whether they could have been more successful in the absence of Defendants' exclusionary practices." *See* Plaintiffs' Brief, p. 29 n. 21. The increase in income and the expansion in their practice may, in

fact, be reflective of the lack of any exclusionary tactics. It may also, however, be simply a testament to Plaintiffs' skills as physicians and to their business acumen. Reasonable people could disagree—it presents a factual question.

In short, it may well be that the Plaintiffs are not efficient enforcers of the law. However, the Defendants have not persuaded me of as much at this procedural juncture. As stated in my earlier Opinion on this issue, the concept of standing necessarily entails consideration of the factual nuances present in each case. Here, the Defendants have not discussed the appropriate standard, nor the standard as it applies to the factual nuances in this case. Instead, they would have this Court essentially adopt a *per se* rule denying standing to any physician who challenges alleged exclusionary practices. No court has adopted such a rule, and I decline the Defendants' invitation to do so.[2]

### (B) Market Power

The Defendants also seek dismissal of Count IV based upon the alleged lack of market power. Specifically, the Defendants contend that "[i]n order to establish that conduct violates § 1 under the rule of reason, Plaintiffs have the burden of proving (1) that Defendants' conduct had an anticompetitive effect in the relevant market; and (2) that no pro-competitive rationale would justify the conduct." *See* Defendants' Brief, p. 17, *citing, Retina v. Southern Baptist Hospital of Florida*, 105 F.3d 1376, 1383 (11th Cir.1997).

While the Defendants proffer evidence in the form of an expert report suggesting that they lack the requisite market power, the Plaintiffs provide contrary evidence, also in the form of an expert report. *See* Defendants' Ex. 3 and Plaintiffs' Ex. 59. Genuine issues of material fact exist regarding the issue of market power, rendering the matter inappropriate for resolution at this procedural juncture.

### (C) Lack of Concerted Action

The Defendants correctly allege that to establish a claim under § 1 of the Sherman Act, a plaintiff must prove a "concerted action by the defendants...." *Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 639 (3d Cir.1996). "'Concerted action' is a 'collective reference to the contract combination or conspiracy.'" *Kerth v. Hamot Health Foundation*, 989 F.Supp. 691, 698 (W.D.Pa. 1997), *aff'd*, 159 F.3d 1351 (3d Cir.1998), *cert. denied*, — U.S. —, 119 S.Ct. 618, — L.Ed.2d — (1998), *citing, Mathews*, 87 F.3d at 639. "It requires 'a unity of purpose or a common design and understanding or meeting of the minds in an unlawful arrangement.'" *Id., citing. Mathews*, 87 F.3d at 639. "A plaintiff's evidence must tend to exclude the possibility that the defendants were acting independently." *Id.* (citations omitted). Accordingly, unilateral action cannot violate § 1, *Id.* (citations omitted). Finally, "a plaintiff's theory of concerted action must be economically plausible." *Id.*

The Defendants contend that the record is devoid of any proof of concerted action, and that the Plaintiffs' theory of concerted action is not economically plausible. *See* Defendants' Brief, p. 28–30. As to the first assertion, the record suggests that Frazier, as a member of the Hospital's Board, voted in favor of the Moratorium. It is reasonable to infer that, in so doing, Frazier was also acting on behalf of Frazier & Hart, a beneficiary of the Moratorium. Certainly the Defendants have not identified any case law suggesting such an inference to be impermissible.

As to the second assertion, the record is replete with an economically plausible theory for the action. Evidence suggests that, in establishing the Moratorium, the Hospital sought to bar cardiologists from Pittsburgh from obtaining staff privileges and then have their Washington patients undergo procedures in Pittsburgh hospitals. Such an outcome would obviously cause the Hospital to

---

**2.** If such a *per se* rule existed, the legion of cases denying physicians standing would presumably be decided at the motion to dismiss juncture, rather than after the close of discovery and in the context of a motion for summary judgment. Yet the cases are being decided at the Rule 56(c) stage, suggesting that any decision necessarily turns on the particular circumstances of the case, rather than on a *per se* rule.

suffer a loss of revenue. Additionally, Frazier and Hart benefitted from the Moratorium by securing an exclusive contract with the Hospital. Granting additional staff privileges would likely have caused Frazier and Hart a loss of income. Similarly, absent an exclusive contract, Frazier and Hart could have performed procedures at other nearby hospitals, again threatening the Hospital's income stream.[3]

### III. Count V— § 2 of the Sherman Act

In Count V of the Amended Complaint, Plaintiffs contend that:

> Defendants Frazier and Hart conspired together to induce the Hospital to give them an exclusive contract for the performance and interpretation of inpatient cardiac procedures; to enact a moratorium prohibiting the consideration of additional cardiologists for appointment to the medical staff; and to direct members of the medical staff to refer their patients to Defendants only.

*See* Amended Complaint, ¶ 76. According to Plaintiffs, this conspiracy constitutes a violation of § 2 of the Sherman Act.

■ The Defendants counter that a conspiracy to monopolize requires proof of "an agreement or understanding between two or more economic entities." *Castelli v. Meadville Medical Center,* 702 F.Supp. 1201, 1207 (W.D.Pa.1988), *aff'd,* 872 F.2d 411 (3d Cir. 1989). As sole shareholders, owners and officers of the same corporation (Frazier–Hart, Inc.), the Defendants reason, they cannot have conspired with each other The Defendants cite to a passage from the Supreme Court's opinion in *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 769–71, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628 (1984), in support of this proposition:

> [t]he officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing

divergent goals.... For these reasons *officers or employees of the same firm do not provide the plurality of actors imperative for section 1 conspiracy.*

(emphasis added); *see* Defendants' Brief, p. 32; *see also, Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1135 (3d Cir. 1995) (stating that "[h]ence, Carrier Express and Oak Management constituted one economic unit. Thus we hold that Oak Management and the Carrier Express agents could not conspire with Carrier Express or with each other under section 1....").

The Defendants also cite to authority for the proposition that the *Copperweld* "plurality" requirement is equally applicable to a conspiracy to monopolize under § 2. *See* Defendants' Brief, p. 32, *citing, Re/Max Int'l. v. Realty One, Inc.,* 900 F.Supp. 132, 153 (N.D.Ohio 1995) and *Potters Medical Center v. City Hospital Assoc.,* 800 F.2d 568, 574 (6th Cir.1986).

Significantly, the Plaintiffs offer no response to these assertions. Because Plaintiffs are clearly represented by competent counsel, and have vigorously pressed their point in other matters, I can only presume that their lack of a response in this matter is a concession to the accuracy of the Defendants' argument. Consequently, the Defendants' Motion is granted in this respect and judgment is entered in their favor, and against the Plaintiffs, on Count V.[4]

### IV. Count II—Breach of Contract

■ In Count II, Plaintiffs assert a claim for breach of contract based upon a contractual right to have Allen receive "fair consideration" when he sought staff privileges at the Hospital. The Defendants again contend that the evidence unequivocally establishes that Allen was given fair consideration. I disagree for the reasons set forth above. I similarly disagree with the Defendants' contention that the Plaintiffs have not adduced sufficient evidence of damages on this claim.

---

3. The fact that the Plaintiffs may not have initially understood the Defendants' economic motive does not mean that the motive was not economically plausible.

4. Given this disposition, I need not consider the other arguments raised in support of the Motion, Obviously, however, any arguments discussed in the context of Count IV, which the Defendants also raise with respect to Count V, would be resolved in the same manner.

*See* Donohue Dep., p. 138–39, 141–42, 162–64, 171–72, 174, 196–97, and 201–06. Consequently, the Motion for Summary Judgment is denied with respect to Count II.

### V. *Count III—Intentional Interference with Prospective Contracts*

In Count III of the Amended Complaint, the Plaintiffs seek recovery for the intentional interference with prospective contractual relations. Specifically, the Plaintiffs argue that the Defendants' institution of a Moratorium, and the granting of an exclusive contract to Frazier–Hart, Inc., was intended to curtail the Plaintiffs' practice. The conspiracy was a success, the Plaintiffs contend, and they were unable to see a number of patients at the Hospital.

The Defendants argue that the claim is not cognizable. The Defendants do acknowledge that Pennsylvania law contemplates a claim for interference with a contract when the interference is directed at third persons. Indeed, the Pennsylvania Supreme Court has explicitly adopted § 766 of the Restatement (Second) of Torts, which provides that:

> [o]ne who intentionally and improperly interferes with the performance of a contract ... between another and a third party by inducting or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*See Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1388 (3d Cir.1991). Further, the Defendants contend, and I agree, that Pennsylvania courts have not adopted § 766A, which addresses interference directed at the plaintiff:

> [o]ne who intentionally and improperly interferes with the performance of a contract ... between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

Restatement (Second) of Torts, § 766A; *See also Gemini Physical Therapy and Rehabilitation, Inc. v. State Farm Mut. Auto. Ins.*

*Co.*, 40 F.3d 63, 66 (3d Cir.1994) (opining that the Pennsylvania Supreme Court would not adopt § 766A).

The Defendants allege that the claim set forth in Count III is premised upon action directed at the Plaintiffs. I agree. Given the Pennsylvania Supreme Court's reluctance to adopt § 766A of the Restatement, they reason, the Plaintiffs' claim cannot go forward.

I agree with the Defendants' ultimate conclusion, though not specifically with their argument. Section 766 and § 766A address interference (directed toward the third party or the plaintiff) with *existing* contracts. Here, Plaintiffs complain of interference with *prospective* contracts. The elements of a tort for interference with prospective contracts is governed by § 766B, which provides:

> [o]ne who intentionally and improperly interferes with another's prospective contractual relation ... is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.

*See* Restatement (Second) of Torts, § 766B.

Research did not disclose any Pennsylvania Supreme Court decision explicitly adopting, *in toto*, § 766B. *See Windsor Securities, Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 661 (3d Cir.1993) and *Silver v. Mendel*, 894 F.2d 598, 601 (3d Cir.1990). Section 766B, with its two subsections, parallels sections 766 and 766A. Thus, § 766B(a) is analogous to § 766, in that both deal with interference directed towards third parties. Similarly, § 766B(b) is analogous to § 766A, in that both deal with interference directed at the plaintiff.

■ Consequently, I find it reasonable to expect that, as the Pennsylvania courts have declined to adopt § 766A, they would similarly be hesitant to adopt § 766B(b). In other words, I believe that Pennsylvania courts

would declare noncognizable, a claim for intentional interference with existing or prospective contracts, where the interference was directed toward the plaintiff, rather than toward a third party. *See Peoples Mortgage Co., Inc. v. Federal National Mortgage Association,* 856 F.Supp. 910, 933 (E.D.Pa.1994) (stating that "[w]e would be equally or more reluctant to predict that the analogous provisions for intentional interference with a prospective contractual relationship, when the alleged interference is directed toward the plaintiff, rather than toward a third party with whom the plaintiff is attempting to establish a contract, would be adopted by the Pennsylvania Supreme Court").

Significantly, the Plaintiffs offer no response to the Defendants' argument. For instance, the Plaintiffs do not argue that the interference complained of was actually directed at third persons. Nor do they dispute that Pennsylvania courts would not recognize § 766B(b). Consequently, in light of the reasoning set forth above, and absent any objection by Plaintiffs, the Defendants' Motion for Summary Judgment is granted as to Count III.