Filed 11/20/15  Kukoyi v. AT&T Services CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| YOMI KUKOYI,<br><br>          Plaintiff and Appellant,<br><br>v.<br><br>AT&T SERVICES, INC. et al.,<br><br>          Defendants and Respondents. | A137597<br><br>(Contra Costa County<br> Super. Ct. No. MSC10-01878) |

Defendant AT&T Services, Inc. (AT&T) terminated plaintiff Yomi Kukoyi from his position as Senior IT Analyst.  Plaintiff appeals from a summary judgment dismissing his complaint against AT&T and "DOES 1 through 100, inclusive."  He seeks to reinstate his claims for national origin, race, age, and disability discrimination, retaliation, harassment, failure to prevent discrimination and harassment, negligent supervision, termination in violation of public policy, violation of Labor Code section 1102.5 (retaliation for disclosing information to a government agency), and violation of the California Constitution, article I, section 8 (employment discrimination).[1]  We conclude his contentions do not require reversal, and accordingly, we affirm the judgment in favor of AT&T.

---

[1]      Plaintiff does not seek to reinstate causes of action for failure to engage in interactive process with disabled employee, failure to accommodate disability by timely transfer from hostile work environment, or violation of Labor Code section 98.6 (reprisal for filing complaint with Department of Fair Employment and Housing).

1

**FACTS**

**A.    Background** [2]

On September 17, 2001, 49-year old plaintiff, an African-American male of Nigerian descent, was hired as a Senior IT Analyst by AT&T.  Six years later, in 2007, plaintiff, just shy of his 56th birthday, was interviewed for an internal job as a Senior IT Analyst in AT&T's "Architecture, Planning & Integration" Department, also known as the Middleware Services Quality Control Team (Middleware Team), located at the AT&T office in San Ramon, California.  The in-person interview was conducted at the San Ramon office by Rosario Mendoza, and Mendoza's immediate supervisor Rita Duran, participated by telephone from her location at AT&T's office in St. Louis, Missouri.  Both Duran and Mendoza made the decision to hire plaintiff.  Before accepting the position, plaintiff signed an "offer letter," informing him that "[d]ue to the needs of the business," the department "expects the person filling this position will remain in place for a minimum of 18 months unless otherwise reassigned, a requested move is approved by the immediate supervisor, or the person's employment is terminated by the employee or the company.  This requirement does not constitute a promise or assurance of continued employment in this or any other Company position."  Plaintiff was also informed that his status remained "as an 'at-will' employee.  This means that the company may terminate your employment for any reason at any time, with or without notice, and with or without cause."

Plaintiff started work in his new position in March 2008.  His then immediate supervisor was "team lead" Mendoza.  Duran was Mendoza's immediate supervisor.  To acclimate plaintiff, Duran and Mendoza initially gave him simple tasks that were normally given to junior analysts, including, but not limited to, making minor updates to

---

[2]    In resolving AT&T's summary judgment motion, the trial court sustained, in part, and overruled, in part, plaintiff's written objections to some of AT&T's proffered evidence, and sustained, in part, and overruled, in part, some of AT&T's written objections to plaintiff's proffered evidence. **A. Background** is consistent with those trial court's rulings on the parties' evidentiary objections for which plaintiff raises no challenges on this appeal.

the Quality Control Handbook (hereafter handbook), assisting a co-worker, learning two software applications, and executing simple software testing assignments. One of his initial projects was to update the handbook. He made several attempts to do so over a period of six weeks, but Duran found errors and/or omissions in each of his submissions. By June 18, 2008, Duran informed plaintiff that she was disappointed he had not been able to make the necessary updates given that only minor changes were required to complete the updates. Duran finished the updates herself so that the handbook could be distributed to the team by the deadline.

On August 1, 2008, plaintiff received his 2008 mid-year evaluation from Duran and Mendoza. Plaintiff was rated as "Does Not Meet" expectations, largely because the quantity of work he had completed was lower than first-level analysts in his team. Plaintiff asked about being released from the department if he found another position, and Duran agreed to release him.

For the next several months, Mendoza informally coached plaintiff. Mendoza, as well as Duran, informed plaintiff of the errors he made during testing procedures and logging of test procedures. These errors were described in email exchanges in August 24-26, 2008, September 17-18 2008, and November 14-17, 2008. Plaintiff never informed Mendoza that her notes concerning the informal coaching sessions were inaccurate.

On November 17, 2008, plaintiff met with Mendoza (in person) and Duran (via telephone conference) to discuss his third quarter work performance appraisal. He was informed that he would be placed on a 60-day formal coaching plan starting that day, November 17, 2008, and expiring on January 15, 2009. There would be weekly meetings among plaintiff, Mendoza, and Duran, to discuss plaintiff's previous week's performance. Duran informed plaintiff "that the goal of the Formal Coaching Plan is to work with him to bring his performance up to an acceptable level. If the Formal Coaching Plan is not successful, however, and his performance continues to be less than satisfactory, then the consequences will be that he will be placed on a Performance Improvement Plan (PIP). The PIP will last 30 days and if his performance does not

3

improve after the PIP, then the consequences will be termination of employment." Plaintiff said he had no questions at that time, there was nothing he felt he should be doing that he was not doing, and there was nothing that Duran or Mendoza could do to assist him in improving his performance. Plaintiff said he was trying to do better each day, he was reading documents and he was reaching out and communicating when he needed help. He complained, however, that "this policing is the most uncomfortable thing," and he felt everything he had done was wrong, and he would "leave it at that." Duran denied that she and Mendoza were policing plaintiff. Duran explained that she was only measuring his performance against the objectives listed in the formal coaching plan, but she was not confident that he could perform the software testing assignments given to him.

Three days later, on November 21, 2008, plaintiff sent an email to Duran, explaining that he was determined to make the formal coaching plan work, but he requested to work in an atmosphere conducive to success and not one that just focused on the things that he did not do correctly. He complained that he should not feel that his every move was being monitored by Mendoza and Duran, and he should be free to speak with his co-workers from time to time. He agreed to the supervisors' weekly questioning concerning his understanding of information in work manuals, but noted that "manuals are supposed to be used [as] references and not to be memorized. [¶] Your title gives you a lot of power over me, however, with that power comes responsibility. [¶] I'm just NOT a good match for your group . . . . In June of this year, you did mention that you would release me if I could find another position. I want to take you up on that offer, to be able to look for [an]other opportunity within the Middleware Services or the company as [a] whole." He also stated he had discussed his situation with AT&T employee relations manager Cindy Alden.[3] Duran responded by telling plaintiff that she would still release him if he found a new position.

---

[3] In a declaration Alden confirmed that on November 21, 2008, plaintiff came to see her after he had been placed on a formal coaching plan. Plaintiff was upset and nervous about the possibility of losing his job, and discussed some of the difficulties he was

Pursuant to the formal coaching plan, plaintiff met with Mendoza (in person) and Duran (via telephone conference) on a weekly basis. Each session lasted approximately one hour and was documented. Plaintiff was given a copy of the document describing the session. According to Duran, plaintiff continued to exhibit a lack of understanding and knowledge of the department's processes and software testing requirements. Duran asked another team lead Michael Fitzhugh to evaluate one of plaintiff's assignments while Mendoza was on vacation. Fitzhugh gave plaintiff a less than passing score, noting that plaintiff had used incorrect coding for the test plan, improperly described the test cases, and incorrectly described the method and omissions related to verifications. On January 15, 2009, plaintiff's formal coaching plan ended. Because plaintiff had failed to show improvement, Duran and Mendoza recommended placement of plaintiff on a formal PIP, which was approved by Alden.

On February 2, 2009, Mendoza (in person) and Duran (via telephone conference) met with plaintiff to discuss his work performance. By that time, plaintiff had been in his position for 11 months. Duran told plaintiff that because he had not met his work objectives during the formal coaching, he was being placed on a 30-day formal PIP, effective February 2, 2009, and expiring on March 4, 2009. Duran confirmed that plaintiff did not plan to take a vacation during the 30-day period. Duran further informed

_____

having concerning his work. Alden told him that he needed to spend the next 60 days working diligently to improve his performance. Alden assured plaintiff that he was not being asked to do anything that was inappropriate, and that Duran would be documenting the coaching sessions. Alden also assured plaintiff that Duran was not "picking on him," but Duran needed "a reasonable contribution from him in order to meet the goals and objectives of the organization." Plaintiff complained that the job was not a "good fit," and he wanted a different job. Alden replied that plaintiff would have to work with Duran on his " 'releasibility,' " "but he still needed to show immediate and sustained performance improvement, even if he [was] looking for another position," and "if his performance [did] not improve at the end of 60 days and he [was] moved to a formal PIP, he [would not] be eligible to look for other positions." In order to transfer to another position, an employee had to apply for an open position, the hiring manager of the open position had to agree to the hire, and the employee's current supervisor was required to release the employee if the employee had been in the current position less than 18 months. Generally, an employee on a PIP was not allowed to transfer.

5

plaintiff that if he did not demonstrate immediate and sustained improvement during and following his successful completion of the PIP, he might be subject to disciplinary action up to and including a dismissal, and that "termination" could occur at any time during the plan if his performance continued to decline or he did not make adequate progress. Plaintiff responded by telling Duran that he did not believe in her management style, and that she was taking advantage of the process "to accomplish [her] own mission." Duran explained why she found plaintiff's work to be "below expectations," to which he replied that he did not agree with Duran's assessment. When asked to specify his disagreement, plaintiff replied that it was going to be Duran's word against his word. When Duran asked if she could do anything to assist him in improving his performance, plaintiff said, "Just let me do my job. Create a non-oppressive environment. The environment here is very oppressive and hostile." Duran asked for examples and plaintiff replied, "When somebody higher than you tells you, you will know. Just leave me alone and let me do my work and call off the attack."

Following the February 2, 2009, discussion with his supervisors, plaintiff contacted the AT&T Ethics Hotline that same day to register his concerns regarding the methods used to manage his performance. He alleged he was being "harassed" by being placed on a PIP by Duran, he was not a "good fit" for the department, and he wanted to be released to go to another position. Plaintiff also sent an email to AT&T Executive Director Gregory Schlake, with a copy to Duran, in which plaintiff again complained about being placed on a PIP and Duran's "oppressive, hostile, and abusive" management style. Plaintiff asserted that both current and former unidentified employees would corroborate his description of Duran's "management style."

The concerns plaintiff expressed in his message left on the AT&T Hotline were investigated by AT&T employer relations manager Paula S. French. French attempted to contact plaintiff but learned that he had called in sick. French also contacted both Duran and Alden; each explained the procedures they had followed before placing plaintiff on a PIP. Duran also stated she willing to release plaintiff if he found another position.

6

French concluded that Duran had followed the proper procedures before placing plaintiff on a PIP.

On February 5, 2009, three days after he was placed on a PIP, plaintiff sent an email to Duran and Mendoza, telling them that he was going to the hospital and would not be at work. He went on disability leave for anxiety, stress, and depression, pursuant to the Family Medical Leave Act (FMLA) for twelve weeks until the end of April 2009. After his FMLA leave expired, AT&T informed plaintiff that he was "on a denial of disability leave from May 1, 2009, through June 30, 2009, putting him at risk of being terminated."

On June 19, 2009, while still on leave, plaintiff filed his first complaint with the Department of Fair Employment and Housing (DFEH). In that complaint, plaintiff asserted he had been a victim of "groundless hostility and overt discrimination. The racial discrimination was inexplicable because the new group [was] comprised [of] people of different races. However, the antagonism against me was so unrelenting that I had to take sick leave to cope with my depression and anxiety." He claimed the stress and anxiety had affected him to the point where he was disabled. More specifically, plaintiff asserted that on a regular basis Duran subjected him to unprovoked fits of anger, "she has yelled and screamed at me [on] the telephone." Plaintiff also asserted that both Duran and Mendoza had unjustly accused him of being incompetent. He alleged that the two negative evaluations he had received from Duran and Mendoza were not accurate and were prepared to provide a false reason to terminate him. When he approached Duran about the evaluations, he was placed on a measurable PIP in retaliation. Plaintiff believed Duran and Mendoza wanted to exclude him from the department and to find a false reason to do so. "Because of the different and adverse treatment" he had received, he could "only conclude that their conduct is because of [his] race and national origin."

He contended the PIP was initiated in retaliation for his complaint about the false and inaccurate evaluations and was designed to develop a false reason to terminate him.[4]

On June 22, 2009, the DFEH issued a letter, stating it would take no action on plaintiff's complaint and it closed the case, "effective June 19, 2009," because plaintiff had requested an immediate right-to-sue letter. Two days later, plaintiff's counsel sent AT&T a letter, in which counsel informed AT&T that plaintiff would be returning to work on June 29, 2009, with a medical release from his doctor requesting certain accommodations related to "his disability." Counsel asserted that plaintiff had a good history as an employee of AT&T and had received good performance evaluations from his previous supervisors and managers, but in his current position he was being subjected to "hostility, harassment, discrimination and when he raised his concerns, retaliation." Counsel asked AT&T to conduct an investigation to confirm the legitimacy of plaintiff's complaints and take appropriate corrective action. Counsel also asked AT&T not to retaliate against plaintiff, upon his return from "disability leave," by terminating him prior to an appropriate investigation being conducted into his "discrimination and retaliation" charges.

In late June 2009, Lisa Andrejko, an equal employment opportunity consultant for AT&T, investigated plaintiff's allegations of discrimination based on his age, race and national origin. Andrejko interviewed fourteen people including plaintiff, Duran,

---

[4]    In opposing AT&T's motion for summary judgment, plaintiff submitted a declaration in which he essentially reiterated the allegations he made in his DFEH complaint. He averred, in pertinent part, that "[o]n a regular basis DURAN subjected me to unprovoked fits of anger in which she has yelled and screamed at me over the telephone. I tried to communicate with both DURAN and MENDOZA, but they would only unjustly accuse me of being incompetent." He also averred that the negative performance evaluations did not claim that he did not complete his job requirements in a business-like and professional manner. "Rather, I was accused of deficient performance in non-measurable categories, such as '[f]ailure to consistently produce acceptable deliverables' and '[f]ailure to demonstrate an understanding of assigned applications and testing projects.'" He was informed and believed, and therefore averred that his "placement on a performance improvement plan was tantamount to being set up for a termination and that the way I was treated represented a defacto demotion."

8

Mendoza, and several current analysts who reported to Duran. Andrejko also reviewed numerous documents, including plaintiff's performance appraisals prepared by Duran and Mendoza, plaintiff's prior performance appraisals, and the documents describing plaintiff's informal and formal coaching plans and his PIP. Andrejko issued a 23-page report on July 1, 2009, in which she stated that she could not confirm plaintiff's allegations of discrimination, retaliation, or hostile work environment. Andrejko also could not confirm that plaintiff's last two evaluations, prepared by Mendoza or Duran, were inaccurate or prepared to provide a false reason to terminate him. Instead, Andrejko confirmed that plaintiff had performance issues in his current position that were known to some of his coworkers and similar performance issues were reported on prior evaluations in other positions.

In late June 2009, while plaintiff was still on a leave of absence, his group was assigned a new team lead Jeanne Corvo, in place of Mendoza. Plaintiff returned to the office in July 2009, on a modified schedule, working half-days. From July 7, 2009 to July 16, 2009, Corvo scheduled meetings twice a week with plaintiff to provide assistance and guidance on his work assignments and to answer his questions. These meetings were known as " 'Touchstone' " meetings, and plaintiff's attendance was voluntary. During this time, plaintiff was given primarily administrative and training-related assignments. Plaintiff took another leave on July 16, 2009, and was absent from the office for the next two months until September 16, 2009.

On September 17, 2009, plaintiff returned to the office on a full-time basis and was again given primarily administrative and training-related assignments to transition his return to work. Corvo had Touchstone meetings with plaintiff from September 17, 2009, through November 24, 2009. Corvo took notes concerning the meetings, and she asked plaintiff to let her know if he disagreed with the written minutes. Plaintiff never told Corvo that her notes were inaccurate. According to Corvo, plaintiff continued to have performance issues including making specified errors in his assigned tasks. Corvo believed that plaintiff, as a Senior IT Analyst with testing experience, should have been able to perform his assigned tasks after a few months in the department.

9

On November 10, 2009, Corvo (in person) and Duran (via telephone conference) met with plaintiff to discuss his performance. Duran informed plaintiff that since his return to work on September 17, 2009, his performance had not met standards despite being given training materials and coaching on software testing procedures. Duran reinitiated a 60-day formal PIP, effective that date, November 10, 2009, and expiring on January 10, 2010. Duran again informed plaintiff that if he did not demonstrate immediate and sustained improvement during and following his successful completion of the PIP, he might be subject to disciplinary action up to and including a dismissal, and that "termination" could occur at any time during the plan if his performance continued to decline or he did not make adequate progress. Plaintiff asked Duran on what basis his work performance was not acceptable since his return to work. Duran reviewed plaintiff's performance with him as she discussed his PIP objectives.

During the period of the reinitiated PIP, Corvo (in person) and Duran (via telephone conference) had two additional meetings with plaintiff regarding his progress. According to Duran, plaintiff continued to exhibit a lack of understanding of software processes and testing requirements, continued to make errors in testing and recording time, and failed to meet target dates. At the second meeting on November 25, 2009, Corvo and Duran reviewed plaintiff's deficiencies, including testing errors (29 problems with 36 tests he had executed), time reporting errors, and his failure to complete software tests. Plaintiff responded by making statements: "[b]ottom line there's nothing I can do that's good enough for you," "[y]ou will not drive me crazy," "[y]ou will not get to me again," and "[t]here is nothing honest from you." Following the November 25, 2009, meeting, plaintiff immediately went out on leave and was absent from the office for the next five months until April 21, 2010.[5]

---

[5] While out on leave, on December 28, 2009, plaintiff filed an amendment to the closed DFEH complaint, including additional allegations of "harassment, denial of transfer, denial of accommodation, failure to prevent discrimination, retaliation, and failure to conduct an investigation because of age, race, national origin, retaliation for filing DFEH Complaint and requesting accommodation." On December 30, 2009, the

Following his return to the office on April 22, 2010 and for approximately the next two months through July 6, 2010, plaintiff worked a modified half-day schedule. He was again given primarily administrative and training-related assignments. According to Duran, plaintiff continued to have similar performance problems in time reporting and documenting software tests. From July 6, 2010 through August 5, 2010, save for one day, plaintiff was out of the office, using sick days, vacation days and personal days. After consultation with the staff in the human resources department, Duran terminated plaintiff effective August 5, 2010. In the termination letter, plaintiff was informed that he was being terminated due to his "poor performance." He was further told, "As you know, your job performance over the last several years has been poor. Most recently, the company gave you over three months to demonstrate satisfactory job performance and you failed to do so. The company does not foresee any improvement in your job performance, and thus is no longer willing to continue your employment."[6]

### B.    Trial Court Proceeding

Before his termination, plaintiff commenced this lawsuit on June 18, 2010, by filing a complaint against AT&T; the operative pleading, a first amended complaint for damages and injunctive relief, was thereafter filed on November 16, 2010. AT&T filed an answer on May 17, 2011, and was later granted permission and filed an amended answer on July 27, 2012. Following extensive discovery, AT&T filed its motion for summary judgment, which was opposed by plaintiff. The trial court granted the motion in a written decision.

The court dismissed the first, second, third, and fourth causes of action for discrimination based on nation origin, race, age and disability discrimination,

---

DFEH issued a right to sue letter after closing the "amended closed discrimination complaint."

[6]    After he was terminated, plaintiff filed another DFEH complaint on September 7, 2010; DFEH took no action, closed the case, and issued a right to sue letter on September 9, 2010. Plaintiff filed an amended DFEH complaint on October 7, 2010; DFEH again took no action, closed the case, and issued a right to sue letter on November 3, 2010.

11

respectively. It found that plaintiff had failed to meet his burden of showing a " '*prima facie* case' " of discrimination because he had " produced *no evidence* to establish that he was performing his job competently, one of the required elements of a prima facie case." Even if plaintiff had met his prima facie burden, the court found that "AT&T ha[d] unequivocally established a legitimate, nondiscriminatory reason for [p]laintiff's termination," based on "[t]he undisputed facts" that plaintiff had been terminated for poor job performance, that he had struggled to perform his job satisfactorily from the time he was hired as a Senior Analyst for the Middleware Team, that he had been given over two years of intensive informal and formal training and coaching, and evaluated not only by the two individuals he accused of unlawful discrimination, Duran and Mendoza, but by other team leads, Corvo and Fitzhugh, who all considered plaintiff's performance inadequate. The court also found that plaintiff had "set forth *no admissible evidence* that the person who made the decision to terminate him, Rita Duran, did so for any other reason than his poor job performance."

As to the cause of action based on disability discrimination, the court additionally found no merit to plaintiff's allegation that he had been "terminated after he was placed on disability leave on August 5, 2010." According to the court, the undisputed evidence showed that plaintiff had not been at work from July 6, 2010 to August 5, 2010, with the exception of one day, using sick days, vacation days and personal days to cover this extended time off, and that on August 5, 2010, plaintiff was not "on an approved leave for a medical condition and had no physician's certificate" for that date. By his "own admission," plaintiff called in on August 5, as he had been doing, and reported that he was ill, and AT&T reported the time off as sick leave. Consequently, at the time plaintiff was terminated on August 5, AT&T was not aware of any alleged disability or medical condition and it had not received a doctor's certificate on August 5. The court further noted that the evidence demonstrated that AT&T had apparently made every reasonable accommodation for plaintiff's disability including approval of leaves of absence for his alleged stress disability brought on by the PIP, freely allowing him vacation, sick, and personal days, and providing modified work schedules when he returned from his leaves

12

of absence. "While [d]efendant did not transfer [p]laintiff out of the Middleware Team, it had no obligation to transfer an employee so that he could work for a different supervisor."

The court also dismissed the sixth cause of action for retaliation and the twelfth cause of action for violation of Labor Code section 1102.5 (retaliation for disclosing information to a government agency). The court found that plaintiff had failed to meet his prima facie burden of showing that he had engaged in a "protected activity," such as "opposing any practices forbidden under the FEHA [Fair Employment and Housing Act], or filing a complaint, testifying or assisting in a proceeding under the FEHA." According to the court, it was undisputed that plaintiff had not complained about unlawful discrimination of any kind until after he was placed on a final PIP on February 2, 2009, and he did not file his first DFEH complaint until June 19, 2009. Following plaintiff's placement on a PIP, plaintiff made internal complaints to Schlake and AT&T's Ethics Hotline. However, the court found those complaints could not be fairly characterized as "protected activity," because plaintiff did not complain about unlawful conduct under the FEHA or mention any form of illegal discrimination. He complained only that he was not a " 'good fit' " for the Middleware Team and he felt the methods Duran and her team leads had used to improve his performance were " 'abusive' and counterproductive."

Lastly, the court found that because plaintiff's discrimination causes of action failed, his related causes of action for harassment (seventh), failure to prevent discrimination and harassment (eighth), negligent supervision (tenth), violation of California Constitution, article I, section 8 – employment discrimination (thirteenth), and termination in violation of public policy (fourteenth), must also fail as a matter of law.

Judgment in favor of AT&T was entered on November 16, 2012. Plaintiff's timely appeal ensued.

13

## DISCUSSION

### I. Causes of Action of Discrimination Based on Age, Race, National Origin, and Disability Under the FEHA

Plaintiff seeks reinstatement of four causes of action alleging discrimination based on national origin, race, age, and disability, under the FEHA (Gov. Code, §§ 12940, 12941). We see no merit to his contentions.

In order to prevail on his discrimination causes of action, which are ones of " 'disparate treatment,' " plaintiff "must show that [AT&T] harbored a discriminatory intent. In most cases, [like this one], the plaintiff [has not] produced direct evidence of [AT&T's] intent, but [relies] . . on circumstantial evidence and the inferences that may be drawn therefrom. 'Consequently certain rules regarding the allocation of burdens and order of presentation of proof have developed in order to achieve a fair determination of "the elusive factual question of intentional discrimination." ' " (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 195, quoting from *Mixon v. Fair Employment & Housing Com*. (1987) 192 Cal.App.3d 1306, 1317, and citing *Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248, 255, fn. 8; see *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802 (*McDonnell Douglas*); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354-356 (*Guz*).[7])

"In particular, California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination . . . based on a theory of disparate treatment." (*Guz, supra*, 24 Cal.4th at p. 354, citing to *McDonnell Douglas, supra,* 411 U.S. 792.) "At trial, the *McDonnell Douglas* test places on the plaintiff the initial burden to establish a prima facie case of discrimination. . . . [¶] The specific elements of a prima facie case may vary depending on the particular facts. [Citations.] Generally, the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing

---

[7] "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." (*Guz, supra*, 24 Cal.4th at p. 354.)

competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive. [Citations.] [¶] If, at trial, the plaintiff establishes a prima facie case, a presumption of discrimination arises. [Citations.] [¶] . . . [A]t this trial stage, the burden shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to 'raise [ ] a genuine issue of fact' and to 'justify a judgment for the [employer],' that its action was taken for a legitimate, nondiscriminatory reason. [Citations.] [¶] If the employer sustains this burden, the presumption of discrimination disappears. [Citations.] The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive. . . . The ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff." (*Guz, supra,* at pp. 354-356, fn. omitted.)

The burden-shifting in employment discrimination cases is somewhat altered where, as here, the employer, AT&T, has moved for summary judgment. AT&T must show either that the plaintiff cannot establish one or more elements of his prima facie case, or that one or more legitimate, nondiscriminatory and nonretaliatory reasons motivated its allegedly adverse employment actions. (*Guz, supra,* 24 Cal.4th at p. 356.) If AT&T meets this initial burden, the burden then shifts to plaintiff to produce substantial evidence either that AT&T's stated nondiscriminatory and nonretaliatory reason for the adverse employment actions were untrue or pretextual, or that AT&T acted with a discriminatory or retaliatory animus, or a combination of the two, such that a reasonable trier of fact could conclude AT&T engaged in intentional discrimination. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 (*Hersant*).)

Plaintiff presents extensive argument challenging the trial court's ruling that he failed to establish a prima facie case of discrimination. However, we need not address those contentions. Assuming, without deciding, that plaintiff met his initial burden of demonstrating a prima case of discrimination, the record reflects that AT&T submitted evidence of legitimate, nondiscriminatory reasons for placement of plaintiff on a PIP and

his ultimate termination based on poor performance. "[I]n employer-initiated summary judgment motions, an employer's presentation of evidence showing a nondiscriminatory reason for an adverse employment action, coupled with the employee's presentation of a prima facie case of discrimination, will not result in the need for a trial on the issue of discrimination." (*Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 755.) Instead, the presumption of discrimination disappears, and the burden shifts back to plaintiff to rebut AT&T's "stated nondiscriminatory reason with substantial evidence of its falsity or present other evidence suggesting a discriminatory basis, or some combination of the two such that a reasonable trier of fact could conclude" AT&T engaged in intentional discrimination. (*Hersant, supra,* 57 Cal.App.4th at p. 1004.) However, "an inference of intentional discrimination cannot be drawn solely from evidence, if any, that the company lied about its reasons [for its employment decisions]. The pertinent statutes do not prohibit lying, they prohibit discrimination. [(*St. Mary's Honor Center v. Hicks* (1993) 509 U.S. 502, 521 [113 S. Ct. 2742, 2754-2755].)] Proof that the employer's proffered reasons are unworthy of credence may 'considerably assist' a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons. (*Id.*, at p. 517 [113 S.Ct. at pp. 2752-2753].) Still, there must be evidence supporting a rational inference that *intentional discrimination*, *on grounds prohibited by the statute*, *was the true cause* of the employer's actions. (*Id.*, at pp. 510-520 [113 S. Ct. at pp. 2748-2754].) Accordingly, the great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz, supra*, 24 Cal.4th at pp. 360-361, fn. omitted.)

In arguing that he met his burden of demonstrating a triable issue of material fact of discriminatory conduct, plaintiff relies on *Reeves v. Sanderson Plumbing Products, Inc*. (2000) 530 U.S. 133 [120 S.Ct. 2097] (*Reeves*). "*Reeves* confirmed that, in a particular case, a plaintiff's showing of pretext, *combined* with sufficient prima facie evidence of an act motivated by discrimination, *may* permit a finding of discriminatory

16

intent, and may thus preclude judgment as a matter of law for the employer. (*Id.*, at pp. 148-149 [120 S. Ct. at p. 2109].)" (*Guz, supra*, 24 Cal.4th at p. 361.) However, "*Reeves* made clear that even where the plaintiff has presented a legally sufficient prima facie case of discrimination, and has also adduced some evidence that the employer's proffered innocent reasons are false, the fact finder is not *necessarily* entitled to find in the plaintiff's favor. Thus, the court admonished, its holding should not be interpreted to mean 'that such a showing will *always* be adequate to sustain a . . . finding of liability. *Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance*, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. [Citations.] . . . [¶] Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. These include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case . . . ." (*Reeves, supra*, 530 U.S. 133, 148-149 [120 S. Ct. 2097, 2109], second italics added.) [¶] . . . As *Reeves* indicated, summary judgment for the employer may thus be appropriate where, given the strength of the employer's showing of innocent reasons, any countervailing circumstantial evidence of discriminatory motive, even if it may technically constitute a prima facie case, is too weak to raise a rational inference that discrimination occurred. Such is the case here." (*Guz, supra*, 24 Cal.4th at pp. 361-362, fns. omitted.)

In challenging the trial court's finding that AT&T had demonstrated a legitimate, nondiscriminatory reason for termination, plaintiff asks us to consider the following factors: (a) Duran's assessments were subjective and not substantiated by objective ratings on plaintiff's performance evaluations; (b) plaintiff had worked on a modified

17

schedule under a PIP from April 22, 2010 until August 5, 2010, due to his stress disability and required accommodation, and (c) AT&T "*cite[d] no performance deficiencies during those last months of his performance*," and the record is devoid of any performance deficiencies warranting termination on August 5, 2010, for "continued poor performance." However, plaintiff merely raises triable issues of material fact concerning whether some of the reasons for AT&T's actions "were reasonable and well considered. A trier of fact could find either they were or they were not. What a trier of fact could not reasonably conclude, however, was that [AT&T's] stated reasons were implausible, or inconsistent or baseless; it would not be reasonable to conclude they were pretextual and used merely to veil an act of [racial, national origin, age, or disability] discrimination." (*Hersant, supra,* 57 Cal.App.4th at p. 1009.) An employer has the "right to interpret its rules as it chooses and to make determinations as it sees fit under those rules. '[The FEHA] addresses *discrimination*.' [(*Ferguson v. Veterans Admin.* (11th Cir. 1984) 723 F.2d 871, 872.)] '[It] is not a shield against harsh treatment at the workplace.' [(*Jackson v. City of Killeen* (5th Cir. 1981) 654 F.2d 1181, 1186.)]" (*Nix v. WLCY Radio/Rahall Communications* (11th Cir. 1984) 738 F.2d 1181, 1187 (*Nix*); see *Williams v. Raytheon Co.* (1st Cir. 2000) 220 F.3d 16, 19 [employer's harboring of hostility and unfair treatment standing alone is not probative of discriminatory animus].)

Nor are we persuaded by plaintiff's contention that a triable issue of material fact of discriminatory motive is raised by his assertion that AT&T acted, through Duran, with a discriminatory animus toward other minorities and employees and employees who were disabled or had exercised their rights to medical leave. Relying on declarations of a former AT&T employee Kellie Washington and a current AT&T employee Ingrid Gottschalk, plaintiff asks us to consider those employees' statements regarding Duran's disparate treatment of Caucasian employees and employees of "color," or African descent, and that "[i]n June 2011, less than a year after [plaintiff's] termination, Duran 'laid off' the three remaining African-American employees in her group," leaving no African-American employees in Duran's group. However, the declarations do not describe any circumstances that a rational trier of fact could tie to the decisions regarding

18

plaintiff's negative performance evaluations, the informal and formal coaching, his placement on a PIP, and his termination. [8] (See *Schrand v. Federal Pacific Electric Co.* (6th Cir. 1988) 851 F.2d 152, 156 [evidence of discrimination against other employees excluded as alleged statements of witnesses could not logically or reasonably be tied to the decision to terminate plaintiff], disapproved on another ground in *Hazen Paper Co. v. Biggins* (1993) 507 U.S. 604, 615-616.)  The declarations of Washington and Gottschalk fail to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [AT&T's] proffered legitimate reasons for its action[s] [against plaintiff] that a reasonable factfinder *could* rationally find them 'unworthy of credence,' [(*Ezold v. Wolf, Block, Schorr & Solis-Cohen* (3d Cir. 1992) 983 F.2d 509, 531 (*Ezold*)], and hence infer 'that [AT&T] did not act for [the asserted] non-discriminatory reasons.' [( *Josey v. John R. Hollingsworth Corp*. (3d Cir. 1993) 996 F.2d 632, 638, internal quotation omitted (*Josey*); see *id.* at p. 638 [holding that the proper inquiry is whether plaintiff has proffered sufficient evidence of 'inconsistencies and implausibilities in the employer's proffered reasons']; *Ezold*, *supra*, 983 F.2d at p. 527 ['a plaintiff has the burden of casting doubt on an employer's articulated reasons for an employment decision,' internal quotations omitted]; *Chauhan v. M. Alfieri Co*. (3d Cir. 1990) 897 F.2d 123, 128 (*Chauhan*).)] "  (*Fuentes v. Perskie* (3d Cir. 1994) 32 F.3d 759, 765, fn. omitted (*Fuentes*); see *Hersant, supra*, 57 Cal.App.4th at p. 1005.)

## II.    Cause of Action for Retaliation Under the FEHA

Plaintiff also seeks to reinstate his cause of action for retaliation under the FEHA. We see no merit to his claim.

Under the FEHA, an employer may not "discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any

---

[8]    For the purpose of our analysis, we have considered the declarations of Washington and Gottschalk as submitted to the trial court, save for those portions that were stricken by the trial court and are not challenged on appeal.  Consequently, we do not separately address plaintiff's arguments challenging some of the trial court's rulings on AT&T's evidentiary objections.

proceeding under this part." (Gov. Code, § 12940, subd. (h).) "[I]n order to establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc*. (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).) Relying on the burden-shifting analysis of *McDonnell Douglas, supra*, 411 U.S. at pp. 802-805, "[o]nce an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation 'drops out of the picture,' and the burden shifts back to the employee to prove intentional retaliation." (*Yanowitz, supra,* at p. 1042.)

Plaintiff argues the trial court erred by finding that he could not prove his termination was retaliatory for engaging in protected activity on the ground that he was placed on a PIP in February 2009 before he filed his first DFEH complaint in June 2009. According to plaintiff the evidence shows that *before he was placed on the PIP*, he had made an internal complaint that he was being discriminated against and harassed by Duran when he spoke with Alden on November 21, 2008. He asserts his internal complaint to Alden constituted protected activity within the meaning of Government Code section 12940. He then argues that Duran was informed of his internal complaint and she "created" a paper file entirely of negative criticisms and two months later on February 2, 2009, she initiated a PIP, thus precluding plaintiff from transferring out from her supervision and insuring his termination. However, plaintiff's internal complaint to Alden was limited to Duran's "management style" and he made no complaints that he was being discriminated against or harassed based on any ground *prohibited by the FEHA*. [9] Consequently, we agree with the trial court's decision that plaintiff's November 21, 2008 complaint to Alden did not constitute "protected activity." [10]

---

[9]     Consequently, this case is factually inapposite from the cases relied on by plaintiff: *California Fair Employment & Housing Com. v. Gemini Aluminum Corp*. (2004) 122 Cal.App.4th 1004, 1018 (employee made complaints of religious

20

Plaintiff also argues that the trial court did not give due weight to "[t]he close proximity in time" between his protected activities (including his DFEH complaints, his lawsuit, his requested accommodation for modified duty), and AT&T's adverse employment actions – reinitiation of the PIP and termination. However, once an employer has offered evidence of legitimate, nondiscriminatory reasons for its adverse employment actions, as in this case, "temporal proximity" between the protected activities and the adverse employment actions, standing "alone is not sufficient to raise a triable issue as to pretext . . . . (See *Smith v. Allen Health Systems, Inc.* [(8th Cir. 2002)] 302 F.3d [827,] 833-834; *Annett v. University of Kansas* [(10th Cir. 2004)] 371 F.3d [1233,] 1241; *Sprenger v. Federal Home Loan Bank of Des Moines* (8th Cir. 2001) 253 F.3d 1106, 1113-1114; *Barnes v. Crowne Investments, Inc.* (S.D. Ala. 2005) 391 F. Supp. 2d 1108, 1117-1118; *Shoaf v. Kimberly-Clark Corp.* (M.D.N.C. 2003) 294 F. Supp. 2d 746, 757-758.) This is especially so where the employer raised questions about the employee's performance *before* [the protected activity], and the subsequent [adverse employment actions were] based on those performance issues. (See *Smith v. Allen Health Systems, Inc., supra,* 302 F.3d at p. 834, italics added; *Strong v. University Healthcare System, L.L.C.* (5th Cir. 2007) 482 F.3d 802, 808; *Arraleh v. County of Ramsey* (8th Cir. 2006) 461 F.3d 967, 977-978; *Smith v. Ashland, Inc.* (8th Cir. 2001) 250 F.3d 1167, 1173-1174.)" (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 353 (*Arteaga*).) In this case, " '[s]tanding alone against [AT&T's] strongly supported legitimate reason for terminating [plaintiff], temporal proximity does not amount to more than a scintilla of evidence of [retaliation].' (*Padron v. BellSouth Telecommunications, Inc.* (S.D. Fla. 2002) 196 F. Supp. 2d 1250, 1257, affd. mem. (11th Cir. 2003) 62

discrimination) and *Passantino v. Johnson & Johnson Consumer Products, Inc.* (9th Cir. 2000) 212 F.3d 493, 499, 506 (employee made complaints of sex discrimination).

10      In his reply brief, plaintiff argues that as protected activity we should consider his complaints to Schlake and AT&T's Ethics Hotline, which were made immediately after he was placed on the PIP on February 2, 2009. But, again, plaintiff's complaints to Schlake and AT&T's Ethics Hotline do not constitute allegations of discrimination or harassment based on grounds *prohibited by the FEHA*.

21

Fed.Appx. 317.)" (*Arteaga, supra*, at p. 353.) Plaintiff's attempt to connect AT&T's decisions to a retaliatory motive are unavailing. His evidence does not show that AT&T gave inconsistent reasons for its actions or that a pattern of antagonism followed any protected activities such that a rational trier of fact could infer retaliation. " 'Employers are sometimes forced to remove employees who are performing poorly . . . . Precedent does not prevent [an employer] from removing such an employee simply because the employee [recently] engaged in a protected work activity . . . .' (*Strong v. University Healthcare System, L.L.C.*, *supra*, 482 F.3d at p. 808, citations omitted; accord, *Taylor v. Volunteers of Am.* (2003) 153 Ohio App. 3d 698, 702 [2003 Ohio 4306, 795 N.E.2d 716, 719].)" (*Arteaga, supra*, at p. 354.)

Lastly, we reject plaintiff's argument that he demonstrated a pattern of conduct consistent with a retaliatory intent. He once again relies on certain statements in the declaration submitted by former AT&T employee Kellie Washington. Specifically, Washington averred that Duran had retaliated against her after Washington gave a truthful statement about Duran's racial bias to Andrejko during the internal EEO investigation of plaintiff's discrimination complaint, and that in June 2011, there were a total of three employees that had been on FMLA leave, two out of three women were African-Americans, and all were laid off after returning from sick leave. According to plaintiff, "[t]his evidence of a pattern of retaliatory conduct by Duran creates an inference and triable issue whether Duran's adverse actions against [plaintiff], including termination, were motivated by retaliation." However, those portions of Washington's declaration cited by plaintiff [11] do not "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [AT&T's] proffered legitimate reasons for its action[s] [against plaintiff] that a reasonable factfinder *could* rationally find them 'unworthy of credence,' [(*Ezold, supra,* 983 F.2d at p. 531], and hence infer 'that [AT&T] did not act for [the asserted] non-discriminatory reasons.' [(*Josey, supra,* 996 F.2d at p. 638, internal quotation omitted; see *id.* at p. 638 [holding that the proper

---

[11]     See fn. 8, *ante*.

22

inquiry is whether plaintiff has proffered sufficient evidence of 'inconsistencies and implausibilities in the employer's proffered reasons']; *Ezold*, *supra*, 983 F.2d at p. 527 ['a plaintiff has the burden of casting doubt on an employer's articulated reasons for an employment decision,' internal quotations omitted]; *Chauhan, supra,* 897 F.2d at p. 128.)] " (*Fuentes, supra,* 32 F.3d at p. 765; see *Hersant, supra*, 57 Cal.App.4th at p. 1005.)[12]

### III. Causes of Action for Harassment, Failure to Prevent Discrimination and Harassment, Negligent Supervision, Termination in Violation of Public Policy, Violation of Labor Code Section 1102.5 (Retaliation for Disclosing Information to a Government Agency), and Violation of the California Constitution, Article I, Section 8 (Employment Discrimination)

Plaintiff also asks us to reinstate his causes of action for harassment, failure to prevent discrimination and harassment, negligent supervision, termination in violation of public policy, violation of Labor Code section 1102.5 (retaliation for disclosing information to a government agency), and violation of California Constitution, Article I, Section 8 (employment discrimination). However, the sole basis for these causes of action is plaintiff's assertions that he raised triable issues of material facts regarding his FEHA discrimination and retaliation causes of action. Because we have concluded that defendant's arguments do not justify reinstating the FEHA discrimination and retaliation causes of action, the related causes of action for harassment, failure to prevent discrimination and harassment, negligent supervision, termination in violation of public policy, violation of Labor Code Section 1102.5, and violation of California Constitution, Article I, Section 8, necessarily fail as a matter of law. (See, e.g., *Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 229 [when plaintiff does not argue an

---

[12] In support of his arguments that he raised a triable issue of material fact of retaliation, plaintiff cites several cases, which are factually inapposite from this case, and, in all events, do not support reversal of the summary judgment in favor of AT&T.

23

independent basis to support claim for wrongful termination in violation of public policy, that claim fails when underlying FEHA claim fails].) [13]

## IV. Conclusion

We conclude our discussion by noting that the FEHA "does 'not guarantee employees "a stress-free working environment" ' " (*Arteaga, supra,* 163 Cal.App.4th at p. 344) because the Legislature "did not enact a 'general civility code' when it passed the FEHA into law." (*Birschtein v. New United Motor Manufacturing, Inc*. (2001) 92 Cal.App.4th 994, 1007-1008.) " 'Nor does the statute require the employer to have a good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason. . . . "While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is . . . whether the given reason was a pretext for illegal discrimination [or retaliation]. The employer's stated legitimate reason . . . does not have to be a reason that the judge or jurors would act on or approve." ' [Citations.]" (*Arteaga, supra*, at p. 344.) Even if AT&T's decision to terminate plaintiff may be " 'incredible' to outside observers," plaintiff has failed to present sufficient evidence that would allow a rational trier of fact to find discriminatory or retaliatory intent on the part of AT&T. (*Nix, supra,* 738 F.2d at p. 1187.) He "has produced neither direct nor circumstantial evidence sufficient to support such [findings]. In the absence of evidence pointing to [discrimination or retaliation] as the explanation for the employer's conduct, we must hold that [plaintiff] has failed to meet his burden" in opposing AT&T's motion for summary judgment. (*Ibid.*)

## DISPOSITION

The judgment filed on November 16, 2012 is affirmed. Defendant AT&T Services, Inc., is awarded costs on this appeal.

---

[13] In light of our determination, we do not need to address AT&T's additional reasons supporting affirmance of the summary judgment in its favor on these related causes of action.

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____
Siggins, J.

*Yomi Kukoyi v. AT&T Services, Inc. et al.*, A137597

25